UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 24-2679 JGB (SPx)** | Date | July 31, 2025 |
|---|---|---|---|
| Title | *Melvia Harris et al. v. City of Los Angeles* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):   Attorney(s) Present for Defendant(s):

None Present   None Present

**Proceedings:**  Order (1) GRANTING Defendants' Motions to Dismiss (Dkt. Nos. 19, 47); (2) VACATING the August 4, 2025 Hearing; (3) STRIKING Dkt. No. 51; and (4) DENYING Request to Appear Remotely (Dkt. No. 54) (IN CHAMBERS)

Before the Court are Defendant City of Los Angeles's Motion to Dismiss and Intervenor-Defendant Strategic Actions for a Just Economy's (SAJE) Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6).  ("City MTD," Dkt. No. 19; "SAJE MTD," Dkt. No. 47.)  The Court determines these matters appropriate for resolution without a hearing.  See Fed. R. Civ. P. 78; L.R. 7-15.  After considering the papers filed in support of and in opposition to the Motions, the Court **GRANTS** the Motions.  The Court **VACATES** the August 4, 2025 hearing.

I.  BACKGROUND

On December 19, 2024, Plaintiffs Melvia Harris and Roberta Knighten ("Plaintiffs") filed a complaint against Defendant City of Los Angeles ("City").  ("Compl.," Dkt. No. 1.)

On February 12, 2025, the City filed a Motion to Dismiss under Rules 12(b)(1) and (6) for lack of jurisdiction and failure to state a claim.  (City MTD.)[1]  Plaintiffs opposed, and the City replied.  ("City MTD Opp'n," Dkt. No. 23; "City MTD Reply," Dkt. No. 39.)

---

[1] In a motion to dismiss under Rule 12(b)(6), a court may consider "matters of judicial notice" without converting the motion into a motion for summary judgment.  U.S. v. Ritchie, 342

On March 17, 2025, Strategic Actions for a Just Economy (SAJE), a tenant rights' organization, sought to intervene in the case. (Dkt. No. 26.) After further briefing, the Court granted the motion and allowed SAJE to intervene as a defendant. (Dkt. No. 45.)

Then, on May 14, 2025, SAJE filed a separate motion to dismiss. ("SAJE MTD," Dkt. No. 47.) Plaintiffs opposed, and SAJE replied. ("SAJE MTD Opp'n," Dkt. No. 49; "SAJE Reply," Dkt. No. 52.)[2]

## II. FACTUAL ALLEGATIONS

The following facts, drawn from Plaintiffs' Complaint or properly the subject of judicial notice, are assumed to be true for the purposes of this Motion. See Am. Fam. Ass'n, Inc. v. City & Cnty. of San Francisco, 277 F.3d 1114, 1120 (9th Cir. 2002).

In 1979, the City of Los Angeles enacted the Rent Stabilization Ordinance (RSO), which is the primary tool for rent control in the city. (Compl. ¶ 2.) L.A., Cal., Mun. Code §§ 151.00–151.35. The RSO only applies to properties built as of October 1, 1978. (Id.)

---

F.3d 903, 907–08 (9th Cir. 2003). A court may take judicial notice of an adjudicative fact not subject to "reasonable dispute," either because it is "generally known within the territorial jurisdiction of the trial court," or it is capable of accurate and ready determination by resort to sources whose "accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

The City requests the Court take judicial notice of several city ordinances, and several other public government reports. ("City RJN," Dkt. No. 20.) Plaintiffs do not oppose. (Dkt. No. 24.) Ordinances and public government reports are properly the subject of judicial notice, and so the Court **GRANTS** the request for judicial notice. Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 498 F.3d 1031, 1039 n.2 (9th Cir. 2007); see also Santa Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006).

In their Motion to Dismiss, SAJE also requests the Court take judicial notice of several city ordinances, public records, and a consumer price index. ("SAJE RJN," Dkt. No. 47-10.) Plaintiffs do not oppose. (Dkt. No. 50.) For the reasons above, the Court **GRANTS** the request as to the ordinances and public records. As to the consumer price index, the Court also **GRANTS** the request. In re Century Aluminum Co. Sec. Litig., 749 F. Supp. 2d 964, 980 (N.D. Cal. 2010).

Finally, in reply, SAJE makes an additional request for judicial notice of a City Council motion and an ordinance. ("SAJE Reply RJN," Dkt. No. 52-1.) As these are public records, the Court **GRANTS** the request.

[2] It appears SAJE twice filed a reply because it omitted an exhibit in its first submission. As such, the Court **STRIKES** the first-filed reply at Docket Number 51 as duplicative.

The RSO uses three overarching mechanisms to regulate rents in Los Angeles. First, the RSO regulates increases in rents. L.A., Cal., Mun. Code § 151.04. While landlords are generally free to raise rents between tenants, the RSO caps the amount rent can be raised each year for continuing tenants is capped at an amount based on the change in the Consumer Price Index over the year. Id. § 151.06(D). The adjustment is a minimum of three percent and capped at eight percent per year. Id. § 151.07(A)(6).

Second, the RSO restricts the grounds upon which landlords can evict tenants. These reasons can include a tenant's failure to pay rent, nuisance, or other reasons defined by ordinance. Id. § 151.09(A). Some of these reasons are considered "at-fault" and some "no-fault." Id. § 151.09(G).

Third, if a landlord wishes to evict a tenant for a no-fault reason, they must pay the tenant a relocation fee ("Relocation Fee Requirement"). Id. §§ 151.09(A)(8), (G), 151.30(E). These fees must be paid immediately to the tenants. The fees for relocation have been set by ordinance since at least 2017 and range from $9,900 to $25,700. (Compl. ¶ 139.) L.A., Cal. Ordinance 184,822 (Apr. 30, 2017).

Amidst the Great Recession, this requirement was altered slightly. L.A., Cal. Ordinance 180,747 (June 18, 2009). The relocation fee for no-fault evictions was raised. Id.; L.A., Cal., Mun. Code §§ 151.09(A)(8), (G). On the other hand, if a landlord owned few properties and was evicting a tenant for owner occupancy, the relocation fees were lowered. Id. 151.30(E). There was, however, one exception. Landlords could not evict disabled and elderly tenants who had been renting for more than ten years for owner occupancy. Id. § 151.30(D)(1).[3]

During the same period, the City began to require landlords of RSO properties to post a notice describing the RSO and giving the City's contact information ("Notice Requirement"). L.A., Cal., Mun. Code § 151.05(I).[4] Landlords must post the standard city-drafted notice, which "walks through the FMR Eviction Restriction, 4% Rent-Increase Cap, and Relocation-Fee Requirement," (Compl. ¶ 73), in "a conspicuous location in the lobby of the property, near a mailbox used by all residents on the property, or in or near a public entrance to the property." L.A., Cal., Mun. Code § 151.05(I).

---

[3] This is not to say that landlords were completely without a remedy. As Plaintiffs point out "the landlord can evict and reclaim the unit for family use only by withdrawing that unit and all others on the property from the rental market and by providing notice of the intent to withdrawal one year in advance." (Compl. ¶ 134 (citing L.A., Cal., Mun. Code §§ 151.09(A)(10), 51.23(B)).) The landlord must pay tenants the relocation fee. L.A., Cal., Mun. Code § 151.09(G), (G)(2).

[4] Plaintiffs reference notice requirements applicable to both RSO and non-RSO properties in their complaint. Because Plaintiffs then go on to discuss how the Requirement "compels RSO-regulated landlords," the Court assumes they are only challenging the RSO-regulated property notice requirements, that is Section 151.05(I).

Recently, during the COVID-19 pandemic, the City adopted two new rent control provisions relevant to this action. In addition to the substantive changes discussed below, the City also made violations of the RSO a misdemeanor. L.A., Cal., Mun. Code § 151.10(B).

First, through two actions, the City capped rent increases at four percent ("Four Percent Cap"). Some context is necessary. In 2020 and in response to the COVID-19 pandemic, the City prevented *any* rent increase for RSO properties "until one year following the termination of the local emergency." L.A., Cal., Mun. Code § 151.32. (Compl. ¶ 47.) The City ended the emergency on February 1, 2023. (Compl. ¶ 47.) The City then set a special rent increase rate of four percent from February 1, 2024 through June 30, 2024. L.A., Cal., Mun. Code § 151.34. According to a City Council Committee report, the four percent rate was based "specifically on the Consumer Price Index from October 2022 through September 2023." ("City Ex. M," Dkt. No. 20-13.) Then, after June 30, 2024, the special provisions expired, and the RSO returned to regular operation. Based on the consumer price index, the allowable rent increase stayed steady at four percent. ("City Ex. N," Dkt. No. 20-14.)

Second, the City enacted a restriction on eviction for tenants who were less than one month behind on their rent ("FMR Eviction Restriction"). A tenant must owe more than "one month" of rent before eviction. L.A., Cal., Mun. Code § 151.09(A)(1). The restriction was enacted to prevent evictions for small rent arrearages. ("City Ex. O," Dkt. No. 20-15, at 267.) Importantly, the past-due threshold is not set based on the actual monthly rent due under the lease but is instead based on the "fair market rent for the Los Angeles metro area set annually by the U.S. Department of Housing and Urban Development for an equivalent sized rental unit 1 as that occupied by the tenant." L.A., Cal., Mun. Code § 151.09(A)(1). For example, between 2024 and 2025, the fair market rent for a one-bedroom unit is $2,081. (Compl. ¶ 57.)

Amidst this backdrop, Plaintiffs are two landlords regulated by the RSO. Plaintiff Harris is a 63-year old teacher who owns two properties in Jefferson Park and Mid-City which she purchased in the 1990s. (Compl. ¶ 75.) Harris rented a one-bedroom unit to a tenant for $1,134 a month, and Plaintiff has been close to two months behind on his rent. Because the tenant has not exceeded the Fair Market Rent ($2,081), Harris has been unable to evict him. (Id.) Harris has also hoped to raise rent by more than four percent to "keep pace with ballooning costs that she cannot control." (Id.) As a result of having to "exhaust her savings to cover her expenses . . . she has found herself living paycheck-to-paycheck." (Id.) She has sold one of her properties, and would like to reclaim the other for family use. (Id.) However, because the tenants are protected (either disabled or elderly and renting for at least ten years) she cannot evict them without having to pay the relocation fees, which she cannot afford. (Id.)

Likewise, Plaintiff Knighten is a retired 68-year old former municipal employee. (Id. ¶ 76.) She manages several rental properties through a trust for the benefit of her children. (Id.) The properties were originally bought by her grandfather in 1930. (Id.) Like Harris, Knighten has been unable to evict a tenant, renting a below-market rate unit, whose arrearages are less than the Fair Market Rent for his unit. (Id.) Also like Harris, Knighten cannot "obtain[] the market-

based rents that could provide the revenue necessary to make continued ownership sustainable" due to the Four-Percent Rent Cap. (Id.) Knighten recently sold one of her properties and is contemplating selling the other. (Id.)

## III. LEGAL STANDARD

### A. Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. "When a defendant moves to dismiss a complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of proving that the court has jurisdiction to decide the claim." Espino v. Regents of the Univ. of California, 666 F. Supp. 3d 1065, 1078 (C.D. Cal. 2023) (citing Thornhill Publ'n Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 733 (9th Cir. 1979)). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). A "district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." Leite v. Crane Co., 749 F.3d 1117, 1121 (9th Cir. 2014) (citing Pride v. Correa, 719 F.3d 1130, 1133 (9th Cir. 2013)).

"A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit. . . . In that event, the suit should be dismissed under Rule 12(b)(1)." Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004) (citations omitted); see also White, 227 F.3d at 1242 ("Because standing and mootness both pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6).").

### B. Rule 12(b)(6)

Under Rule 12(b)(6), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Ileto v. Glock Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994). Courts are not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Sec. Litig., 536 F.2d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted). Courts also

need not accept as true allegations that contradict facts which may be judicially noticed. See Mullis v. U.S. Bankr. Court, 828 F.2d 1385, 1388 (9th Cir. 1987).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Instead, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570; Ashcroft v. Iqbal, 556 U.S. 662 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

## IV. DISCUSSION

Plaintiffs challenge four components of the Los Angeles's rent control system. They raise takings claims as to the FMR Eviction Restriction, Four Percent Rent Cap, and Relocation-Fee Requirement. They also mount an equal protection challenge to the Four Percent Rent Cap. Finally, Plaintiffs challenge the Notice Requirement on First Amendment grounds.

### A.    **FMR-Eviction Restriction (Count I)**

Plaintiffs challenge the FMR Eviction Restriction as an unconstitutional per se and regulatory taking.

#### 1. Physical Taking

The Takings Clause of the Fifth Amendment, which applies to the states through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. Amend. V; Schneider v. California Dep't of Corr., 151 F.3d 1194, 1198 (9th Cir. 1998). In order to succeed on a Takings Clause claim, a plaintiff must show that he possessed a property interest that is constitutionally protected and that the government deprived him of that interest. Schneider, 151 F.3d at 1198. There are two recognized flavors of takings claims: physical and regulatory.

The physical (or per se) taking presents the paradigmatic case: "When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation." Cedar Point Nursery v. Hassid, 594 U.S. 139, 147 (2021). Various types of physical occupation satisfy this test, for example, when the government "uses its power of eminent domain to formally condemn property," "physically takes position of property without acquiring title to it," or "occupies property—say, by recurring flooding as a result of building a dam." Id.

Recall, the FMR Eviction Restriction prevents landlords from evicting tenants when a tenant's rent debt is less than a single month of Fair Market Rent (a HUD calculation) for that type of unit. Plaintiffs argue this effects a physical taking by "mandat[ing] that landlords bear the physical presence of unwanted third parties" who "refuse[] to pay rent unless the overdue amount measures in the thousands of dollars." (City MTD Opp'n at 11.)

Luckily, this is not the first time that Courts in this district, this Circuit, or even the Supreme Court have considered the constitutionality of rent control measures and eviction moratoria. In Yee v. City of Escondido, Cal., 503 U.S. 519 (1992), the Supreme Court considered a local rent control ordinance for mobile home parks that "preclude[d] landlords from evicting their present tenants . . . for most reasons." GHP Mgmt. Corp. v. City of Los Angeles, No. 23-55013, 2024 WL 2795190, at *1 n.2 (9th Cir. May 31, 2024), cert. denied, No. 24-435, 2025 WL 1787663 (U.S. June 30, 2025). The Court found no physical taking because tenants are not third parties—landlords "voluntarily rented their land." Yee, 503 U.S. at 528. Once in the rental market, the ordinance "merely regulate[] [landlord's] use of their land by regulating the relationship between landlord and tenant." Id. Put simply, "statutes regulating the economic relations of landlords and tenants are not per se takings." F.C.C. v. Fla. Power Corp., 480 U.S. 245, 252 (1987).

The Court finds the Ninth Circuit's unpublished disposition in GHP Management Corporation helpful. There, the Court considered the City's eviction moratorium in Covid which "prohibited landlords from evicting or endeavoring to evict a tenant for non-payment of rent 'if the tenant is unable to pay rent due to circumstances related to the COVID-19 pandemic.'" GHP, 2024 WL 2795190, at *1 (9th Cir. May 31, 2024) (quoting L.A., Cal., Mun. Code § 49.99.2(A)). This meant, like with the FMR Eviction Restriction, that a landlord necessarily "must forego rental payments that would otherwise be due under the lease." GHP, 2024 WL 2795190, at *1.[5] That a landlord would miss payments was of no moment, because the moratorium, though it restricted one reason for eviction (COVID-19 related arrearages), "did not compel landlords to rent property in perpetuity, but rather allowed landlords to evict their

---

[5] The COVID-19 rental moratorium arguably imposed a more significant economic impact on landlords than the FMR eviction restriction. The FMR eviction restriction sets a threshold amount for nonpayment before permitting eviction. A tenant cannot avoid paying rent in perpetuity, they must continue paying rent to keep their debt below one month of Fair Market Rent.

previously invited tenants for reasons not otherwise prohibited."[6] Id. Rent control ordinances can thus permissibly adjust the landlord-tenant relationship, including the "rental amount, terms of eviction, and even the identity of the tenant," so long as landlords can leave the rental market. Id.; Yee, 503 U.S. at 528 (suggesting a physical taking lies where a statute "to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy").

The FMR eviction restriction simply addresses the "terms of eviction" and is not a physical taking under Supreme Court precedent. Id. Landlords, if they so choose, can leave the rental market. The FMR Eviction Restriction does not require landlords to "rent property in perpetuity." GHP, 2024 WL 2795190, at *1. It falls in line with the chorus of decisions upholding eviction restrictions. Plaintiffs have decided to participate in a regulated market, and the FMR eviction restriction permissibly regulates their relationship with their tenants until they decide to leave that market.

Claim 1 is **DISMISSED WITH PREJUDICE** as to the physical taking component.

**2. Regulatory Taking**

On the other hand, where there is no physical invasion of property, the regulatory takings test considers whether government regulations that burden property ownership have "go[ne] too far." Cedar Point, 594 U.S. at 148. In other words, the difference between a physical and regulatory taking "is whether the government has physically taken property for itself or someone else—by whatever means—or has instead restricted a property owner's ability to use his own property." Id. at 149.

Three factors govern whether a regulation constitutes a regulatory taking: "[1] the regulation's economic impact on the claimant, [2] the extent to which the regulation interferes with distinct investment-backed expectations, and [3] the character of the government action." Colony Cove Props., LLC v. City of Carson, 888 F.3d 445, 450 (9th Cir. 2018) (quoting MHC Fin. Ltd. P'ship v. City of San Rafael, 714 F.3d 1118, 1127 (9th Cir. 2013)). The first and second factors are the most important. Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538–39 (2005).

"In considering the economic impact of an alleged taking, we 'compare the value that has been taken from the property with the value that remains in the property.'" Colony Cove, 888 F.3d at 450 (quoting Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987)). The City argues that the allegations are insufficient, and SAJE argues the claim is unripe. (City MTD at 15–18; SAJE MTD at 7–8.)

---

[6] The Court declines to consider much of Plaintiffs' cited authority that is either out of circuit or does not address physical takings. See, e.g., Alabama Association of Realtors v. Department of Health & Human Services, 594 U.S. 758, 765 (2021); Darby Development Co. v. United States, 112 F.4th 1017 (Fed. Cir. 2024); Heights Apartments, LLC v. Walz, 30 F.4th 720 (8th Cir. 2022).

The Complaint is not specific enough for the Court to evaluate whether there has been a regulatory taking. Plaintiffs allege an economic loss of past due rent up to one month's worth of Fair Market Rent. (Compl. ¶¶ 75, 76.) And they allege this loss of one month of Fair Market Rent led to their "decisions . . . to sell some of their RSO-regulated properties." But a "mere loss in income" is insufficient to allege a regulatory taking. Colony Cove, 888 F.3d at 450. Instead, "economic impact is determined by comparing the total value of the affected property before and after the government action." Id. Plaintiffs must speak to the diminution in property value, not a simple loss of income.[7] Because of this defect, the Court does not address the remaining factors, though it turns to SAJE's argument this claim is not ripe.

On the papers before it, the Court does not have enough information to determine if Plaintiffs' regulatory takings challenge to the FMR Eviction Restriction is ripe. SAJE argues that Plaintiff's takings claim is unripe because the economic impact will turn on the rent Plaintiffs charge their tenants. The RSO permits landlords to apply to raise rent in order to receive a "just and reasonable return." L.A., Cal., Mun. Code § 151.07(B). Because Plaintiffs have not requested such an increase, SAJE's theory goes, their challenge is not ripe until they have exhausted their administrative remedies.

The Court cannot make a ripeness determination at this point. Plaintiffs' theory of economic impact is that they have been "deprived . . . of their ability to receive rental income." (Compl. ¶ 99.) Under the FMR restriction, the loss is a sum certain—one month of Fair Market Rent as set by the Department of Housing and Urban Development. It does not turn on the rent Plaintiffs actually charge. The Court is without information to decide if the "pre-deprivation and post-deprivation values of the Property" can be determined without reference to the rent Plaintiffs' currently charge. Colony Cove, 888 F.3d at 451 ("[p]rojected income streams" just one method of determining value). Plaintiffs may be able to advance a theory of valuation that does not turn on whether they have exhausted their administrative remedies.

Count 1 is **DISMISSED** with **LEAVE TO AMEND** under a regulatory takings theory.

//
//
//
//

---

[7] While the Court will grant Plaintiffs leave to amend, their path to stating a regulatory takings claim appears steep. On the face of the allegations, while Plaintiffs allege they have suffered a discrete loss—up to one month's worth of Fair Market Rent—their cash flow otherwise remains the same. These facts, in light of the Ninth Circuit's holdings that a "diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking" and that it is "'aware of no case in which a court has found a taking where diminution in value was less than 50 percent'" could be fatal to Plaintiffs' case. Colony Cove, 888 F.3d at 451 (quoting CCA Assocs. v. United States, 667 F.3d 1239, 1246 (Fed. Cir. 2011)).

### B.     Four Percent Rent Cap (Count II and III)

Plaintiffs challenge the Four Percent Rent Cap as effecting a physical and regulatory taking, as well as violating the Equal Protection Clause.  (Compl. ¶¶ 104–129.)  When Plaintiffs refer to the Four Percent Rent Cap, they are referring to two actions (taken after four years of no rent increases during the COVID-19 Pandemic): (1) a rent increase rate of four percent from February 1, 2024 through June 30, 2024 set by ordinance, and; (2) thereafter, through regular operation of the RSO and determined by the consumer price index, a four percent rent increase through June 2025.  L.A., Cal., Mun. Code § 151.34; City Ex. N.

#### 1.     Statute of Limitations

Plaintiffs' physical takings and equal protection claims are either time-barred or fail on the merits.

Plaintiffs' physical takings claim and equal protection claim fall outside the statute of limitations.  Because "claims brought under § 1983 borrow the forum state's statute of limitations for personal injury claims," Plaintiffs' claims are subject to a two year statute of limitations in California.  Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd., 509 F.3d 1020, 1026 (9th Cir. 2007).  Plaintiffs raise both facial and as-applied challenges to the RSO.  "A facial challenge involves 'a claim that the mere enactment of a statute constitutes a taking,' while an as-applied challenge involves 'a claim that the particular impact of a government action on a specific piece of property requires the payment of just compensation.'"  Ventura Mobilehome Cmtys. Owners Ass'n v. City of San Buenaventura, 371 F.3d 1046, 1051 (9th Cir. 2004) (quoting Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 686 (9th Cir. 1993)).  For a facial challenge, "the cause of action accrues on the date that the challenged statute or ordinance went into effect." Id. at 1027.  For an as-applied challenge, it is when the plaintiff "knows or has reason to know of the actual injury."  Scheer v. Kelly, 817 F.3d 1183, 1188 (9th Cir. 2016)

The RSO went into effect in 1979, and applied to Plaintiffs properties as of that date (because the RSO only applies to properties built in 1978 or earlier).  Action, 509 F.3d at 1027; Norco Constr., Inc. v. King County, 801 F.2d 1143, 1146 (9th Cir. 1986); see also Scheer, 817 F.3d at 1187 ("After a law is enacted, the price of the property is affected, and downstream purchasers of the property will pay less for the property because of the alleged taking. 'A landowner who purchased land after an alleged taking,' therefore, 'has suffered no injury.'" (quoting Carson Harbor Village Ltd. v. City of Carson, 37 F.3d 468, 476 (9th Cir.1994)).  The latest either plaintiff acquired a property subject to the RSO is 2009.  (Compl. ¶ 26.)

Plaintiffs argue their claim escapes the statute of limitations because the rent increase between February 1, 2024 was set by ordinance and thus different from the RSO.  But Plaintiffs argument is too formalistic.  The question is whether the "amendments alter 'the effect of the ordinance upon the plaintiffs.'"  Action Apartment Ass'n, 509 F.3d at 1026 (quoting De Anza Properties X, Ltd. v. County of Santa Cruz, 936 F.2d 1084, 1086 (9th Cir. 1991)).  Here, the

RSO, since 1979 and applied to Plaintiffs as late as 2009, capped rent increases on RSO properties, consistent with the Consumer Price Index, between three and eight percent. Id. § 151.07(A)(6). As SAJE argues, the four percent increase is consistent with what would have been charged under the RSO, and Plaintiffs make no argument otherwise. (SAJE MTD at 4–5 & n.3.) That the implementation came via an ordinance, instead of routine operation of the RSO, does not alter "the effect of the ordinance upon the plaintiffs." Action Apartment Ass'n, 509 F.3d at 1027. Plaintiffs could have complained of the prohibition on rent increases or the distinction between RSO and non-RSO properties earlier and did not. The way in which the City regulates Plaintiffs has not been "substantively altered" and has not given rise to a new cause of action, whether facial or as-applied. Id.

### 2. Ripeness

Plaintiffs' regulatory takings claim is not ripe. In an as-applied regulatory takings claim, "a federal court should not consider the claim before the government has reached a 'final' decision." Pakdel v. City and Cnty. of San Francisco, 594 U.S. 474, 475 (2021).

Under the RSO, landlords can apply to raise rent beyond the ordinary RSO rent cap in order to receive a "just and reasonable return." L.A., Cal., Mun. Code § 151.07(B). Plaintiffs have not done so, pointing out that under the RSO, the departure is "not a mechanism to bring the rents to market rate." Compl. ¶ 113.

It is true that a "just and reasonable return" may not be the market rate of Plaintiff's units, but their argument misses the point. Plaintiffs frame their injury as receiving anything less than market rate rent. That is not the law. Regulatory takings cases are of degrees, not absolutes. In other words, "because a plaintiff who asserts a regulatory taking must prove that the government regulation has gone too far, the court must first know how far the regulation goes." Pakdel, 594 U.S. at 479 (citation modified). One cannot determine "the regulation's economic impact on the claimant" or "the extent to which the regulation interferes with distinct investment-backed expectations" without a determination of how the RSO applies to their property. Colony Cove, 888 F.3d at 450; see also Ballard v. City of West Hollywood, No. CV 23-4367 FMO, 2024 WL 3593999, at *2 (C.D. Cal. Jan. 3, 2024) ("[A] takings claim must be dismissed for lack of finality where the plaintiff could have, but did not, seek a zoning variance."). Even though the City may not permit Plaintiffs to raise their rent to market rates, how close Plaintiffs' rent ultimately is to that market rate will affect the regulatory takings analysis. Plaintiffs' regulatory taking claim is not yet ripe.[8]

//
//

---

[8] Plaintiffs' claim fails for the additional reason that, as discussed above, a "mere loss in income" is insufficient to allege a regulatory taking. Colony Cove, 888 F.3d at 450. Instead, "economic impact is determined by comparing the total value of the affected property before and after the government action." Id. Plaintiffs have not alleged a diminution in value.

### 3. Physical Taking

Even if Plaintiffs' physical taking claim survived the statute of limitations, it would be foreclosed by the Supreme Court's decision in Florida Power. In Florida Power, the Supreme Court found that the FCC's rate setting for telephone pole attachment rentals (reducing charged rates from as high as $7.15 to $1.79 per pole) was constitutional, because the public utility pole owners had "voluntarily entered into leases with cable company tenants renting space on utility poles." F.C.C. v. Fla. Power Corp., 480 U.S. 245, 252 (1987). The Court held that the "distinction between a commercial lessee and an interloper with a government license" (which would constitute a taking) is the "invitation, not the rent." Id.

Florida Power's reasoning applies with equal force to the Four Percent Rent Cap. Plaintiffs are landlords who have entered into a voluntary commercial relationship with their tenants. The RSO regulates the rates landlords can charge their tenants. Landlords are not forced to rent their property, but once they rent their property, they are subject to regulation. And despite Plaintiffs' arguments the Court must relent to the "force of Cedar Point," (SAJE MTD Opp'n at 17), this Circuit has affirmed the force of Florida Power post-Cedar Point. Ballinger v. City of Oakland, 24 F.4th 1287, 1297 (9th Cir. 2022) ("[L]egislative enactments 'regulating the economic relations of landlord and tenants are not per se takings.'" (quoting Florida Power, 480 U.S. at 252)). Plaintiffs do not state a claim for a physical taking.

### 4. Equal Protection Claim

Plaintiffs also argue the Four Percent Rent Cap runs afoul of the Equal Protection Clause by only regulating properties built before 1978. In addition to being time-barred, this claim fails on its merits.

There is no plausible suspect classification, so the Court reviews whether the distinction the RSO draws has a rational basis. "Under rational-basis review, where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation." Hotel & Motel Ass'n of Oakland v. City of Oakland, 344 F.3d 959, 971 (9th Cir.2003) (quoting Bd. of Trs. v. Garrett, 531 U.S. 356, 366–67, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001)). Rational basis review is "highly deferential." Kahawaiolaa v. Norton, 386 F.3d 1271, 1279 (9th Cir. 2004) (citation modified). A regulation has a rational basis where a classification distinguishes between entities it "has no authority to regulate" and those it does. Thornton v. City of St. Helens, 425 F.3d 1158, 1167 (9th Cir. 2005).

The Four Percent Rent Cap's distinction has at least two rational bases. First, as the City points out, because the Costa-Hawkins Act forbids price controls on units constructed after February 1, 1995, and units previously exempt under local rent control ordinances, it can no longer permissibly impose price controls on post-1978 properties. Cal. Civ. Code § 1954.52(a). Distinguishing based on the government's ability to regulate is a rational basis. Thornton, 425 F.3d at 1167. Second, the City points out the distinction is to encourage new housing

construction. City of Los Angeles v. Los Olivos Mobile Home Park, 213 Cal. App. 3d 1427, 1438 (Ct. App. 1989). The Supreme Court has recognized that rent control "represents a rational attempt to accommodate the conflicting interests of protecting tenants from burdensome rent increases while at the same time ensuring that landlords are guaranteed a fair return on their investment." Pennell v. City of San Jose, 485 U.S. 1, 14 (1988) (emphasis added). Here, the City has made a fair attempt to balance multiple goals, including those of tenants, landlords, and developers. The Cap has a rational basis.

Because the legal theory underlying the physical taking and equal protection claims is infirm, or the claims are time-barred, and the regulatory takings claim is not yet ripe, the Court **DISMISSES** Counts Two and Three **WITH PREJUDICE**.

### C.     Relocation Fee Requirement (Count IV)

Plaintiffs challenge the Relocation Fee Requirement as an unconstitutional physical and regulatory taking. (Compl. ¶¶ 130–141.) This claim is time-barred, and when construed as a physical taking, also fails on the merits.

#### 1.     Statute of Limitations

Plaintiffs allege that the Relocation Fee Requirement applied to them at the latest, in 2017. (Compl. ¶ 139.) This lawsuit was filed in 2024, far beyond the two year statute of limitations for § 1983 actions. Plaintiffs respond the taking is a continuing violation. However, the continuing violation doctrine does not apply neatly to Plaintiffs' claim as theorized.

"[T]he act of taking is the event which gives rise to the claim for compensation." Knick, 588 U.S. 180, 190 (2019) (citation modified). For a facial claim, the cause of action accrues at the time a statute is passed because, "the very enactment of the statute has reduced the value of the property or has effected a transfer of a property interest. This is a single harm, measurable and compensable when the statute is passed." Guggenheim v. City of Goleta, 638 F.3d 1111, 1119 (9th Cir. 2010) (en banc) (quoting Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 688 (9th Cir. 1993)). Here, the Relocation Fee Requirement was passed in 2017, so the statute of limitations would have expired in 2019.

Inasmuch as Plaintiffs' claim is construed as an as-applied claim, it fares no better. While an as-applied claim may accrue when a statute is actually enforced against a plaintiff, until that point the injury remains hypothetical. Even so, Plaintiffs' theory is not even one of enforcement, it is that Plaintiff's claim accrued once "she wanted to repossess." (City MTD Opp'n at 24.) However, under Plaintiff Harris's theory, she would have lost the ability to evict without paying a fee in 2017, not when she wanted to repossess. (See also SAJE MTD Opp'n at 6 (explaining that the Relocation Fee Requirement is "depressing the sales price" of the unit).) In other words, Plaintiffs' as-applied theory accrued at the same time her facial challenge did. Plaintiffs allege they have not yet evicted their tenants, so they have not paid any relocation fee—the statute has yet to be specifically enforced against them. The limitations period has elapsed.

### 2. Physical Taking

In the alternative, Ninth Circuit precedent bars Plaintiffs' claim for a physical taking. In Ballinger v. City of Oakland, the Court considered a City of Oakland ordinance that "require[d] landlords re-taking occupancy of their homes upon the expiration of a lease to pay tenants a relocation payment based on rental size, average moving costs, the duration of the tenants' occupancy, and whether the tenants earn a low income, are elderly or disabled, or have minor children." 24 F.4th 1287, 1291 (9th Cir. 2022). The Ninth Circuit held, like other rent control provisions, "the relocation fee required by the Ordinance was a regulation of the landlord-tenant relationship, not an unconstitutional taking of a specific and identifiable property interest." Id. at 1292.

As above, so below. Plaintiffs' claim for a taking is functionally indistinguishable from the claim advanced in Ballinger. As with the City of Oakland's ordinance, the Relocation Fee Requirement requires, for no-fault evictions, that landlords pay tenants a variable fee based on unit size and other factors. L.A., Cal., Mun. Code §§ 151.09(A)(8), (G), 151.30(E).

Plaintiffs try and reframe their argument—pointing out that in Ballinger, the plaintiffs alleged a taking of money, but they allege a taking of property. But Ballinger does not similarly limit its reasoning. Instead, Ballinger explicitly acknowledges that "the relocation fee here is linked to real property." Id. at 1297. Even so, the Ninth Circuit dismissed the argument that a relocation fee was "'functionally equivalent'" to "a taking of an interest in the real property itself." Id. at 1297 (quoting Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595, 612–13 (2013)). "Instead, the relocation fee required by the Ordinance is a monetary obligation triggered by a property owner's actions with respect to the use of their property, not a burden on the property owner's interest in the property." Ballinger, 24 F.4th at 1297 (emphasis added). The Ninth Circuit has already decided that relocation fees are not takings. Plaintiffs' legal theory is infirm, and so the claim must be dismissed.

### 3. Regulatory Taking

Ballinger does not, however, address whether relocation fee requirements constitute a regulatory taking. Ballinger, 24 F.4th at 1292 n.2.

However, Plaintiffs' claim is only for a "mere loss in income," which, as discussed above, is insufficient to allege a regulatory taking. Colony Cove, 888 F.3d at 450. Plaintiffs must explain how the relocation fee affects their property value, not just allege a loss of income. While the Court would ordinarily grant leave to amend on this theory, because the claim is barred under the statute of limitations, Plaintiffs challenge to the relocation fee is dismissed with prejudice.

Plaintiffs' Count IV is **DISMISSED WITH PREJUDICE.**

D.      **Notice Requirement (Count V)**

Apart from their taking claims, Plaintiffs raise a First Amendment challenge to the RSO's Notice Requirement. The Notice Requirement mandates landlords to display a city-drafted notice "walks through the FMR Eviction Restriction, 4% Rent-Increase Cap, and Relocation-Fee Requirement." (Compl. ¶ 73.) As Plaintiffs describe its pertinent parts, the Notice explains that:

> (1) RSO-regulated "landlords may not evict a tenant who falls behind on rent unless the tenant owes an amount higher than the Fair Market Rent (FMR)," and it then provides a grid detailing the applicable FMR value for any given unit; (2) RSO-regulated landlords may not increase rents annually by more than 4% during the period spanning February 2024-June 2025 (while noting that "RSO rent increases were prohibited from March 2020 to January 2024"); and (3) RSO-1 regulated landlords must pay "Relocation Assistance" (the amounts of which are also displayed in a grid) in all circumstances involving "no-fault evictions for all residential units," which includes "occupancy by the owner" or "family member." L.A. Hous. Dep't, City of Los Angeles Renter Protections Notice (rev. Oct. 1, 2024), supra.

(Compl. ¶ 147.) The Notice must be displayed in "a conspicuous location in the lobby of the property, near a mailbox used by all residents on the property, or in or near a public entrance to the property." L.A., Cal., Mun. Code § 151.05(I).

There is no First Amendment violation as alleged. The Supreme Court outlined which rules apply for hosted speech in Rumsfeld v. Foundation for Academic & Institutional Rights, Inc. (FAIR), 547 U.S. 47, 63 (2006).[9] In FAIR, the Court addressed whether requiring law schools to host military recruiters in the same way they accommodated other employers ran afoul of the First Amendment. It did not. When an entity is asked to host speech, the question is whether "the complaining speaker's own message was affected by the speech it was forced to accommodate." Id. at 63. One component of this analysis is the "expressive nature" of the forum. Id. at 64; Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557, 566 (1995) (requiring parade to include gay, lesbian, and bisexual organization violated organizer's First Amendment rights due to "the inherent expressiveness of marching"); Green v. Miss United States of Am., LLC, 52 F.4th 773 n.10 (9th Cir. 2022) (holding that pageant cannot be forced to admit transgender participants because "performers . . . are the pageantry, and the pageantry is the message"). The other is whether hosting speech "interfere[s] with the [plaintiff's] ability to communicate its own message." Id. at 64; compare Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal., 475 U.S. 1, 16–18 (1986) (plurality opinion) (ruling state cannot

---

[9] In other words, the hosted speech test is useful to distinguish when speech is merely hosted—that is, it "does not affect" Plaintiffs' speech—or instead, compelled, and (if commercial) subject to the standards set forth in Zauderer v. Off. Of Disciplinary Couns. of Sup. Ct. of Ohio, 471 U.S. 626 (1985). Because the Court finds the Notice Requirement to be a permissible hosted speech requirement, it does not reach the compelled speech argument.

force utility to send a third-party newsletter when utility already sends its own newsletter), with PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 87 (1980) (holding state constitutional requirement permitting speech and petitioning not violative of the First Amendment because any speaker's views "will not likely be identified with those of the owner" and the landowner "could disclaim any sponsorship of the message").

Fundamentally, the Notice Requirement "neither limits what [Plaintiffs] may say nor requires them to say anything" at all. FAIR, 547 U.S. at 60; see also Nat'l Ass'n of Manufacturers v. Perez, 103 F. Supp. 3d 7 (D.D.C. 2015). Plaintiffs have not sufficiently alleged how their "message was affected by the speech [they were] forced to accommodate." Id. at 63. As SAJE points out, the Notice prominently expresses that is authored by the City, not the Plaintiffs. ("SAJE Ex. U," Dkt. No. 47-16 (displaying Los Angeles Housing Department logo and City of Los Angeles seal at top of page, and titling document "City of Los Angeles Renter Protections Notice").) As alleged in the Complaint, there is no reason Plaintiffs cannot easily "disclaim" the message. PruneYard, 447 U.S. at 87. Likewise, Plaintiffs have failed to explain how the common areas of their buildings are "inherent[ly] expressive[]" in the same way a parade, pageant, or newsletter are. Hurley, 515 U.S. at 566. Taken together, as pleaded, there are no allegations that Plaintiffs' speech has been affected by the Notice.

Plaintiffs' First Amendment claim is **DISMISSED WITH LEAVE TO AMEND**.

## V.    CONCLUSION

For the above reasons, the Court **ORDERS** as follows:

1. The City and SAJE's Motions (Dkt. Nos. 19, 47) are **GRANTED**.

2. Count I as to a regulatory taking and Count V are **DISMISSED WITH LEAVE TO AMEND**.

3. The remaining counts (I (under a physical taking theory), II, III, and IV) are **DISMISSED WITH PREJUDICE**.

4. Plaintiff may file an amended complaint, if any, no later than **August 8, 2025**.

5. The Court **VACATES** the August 4, 2025 hearing.

6. The Court **STRIKES** Dkt. No. 51 as duplicative.

7. Plaintiffs' Request to Appear Remotely (Dkt. No. 54) is **DENIED** as moot.

**IT IS SO ORDERED.**